**UNITED POTATO CO., INC., Plaintiff,**

v.

**BURGHARD & SONS, INC., d/b/a/ Burghard Stein Food Service and/or S.L. Davis, Inc., Defendants.**

No. 97 C 1838.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 19, 1998.

**895**

Stuart S. Hong, Stephen Levy, Stephen Levy & Associates, Chicago, IL, for Plaintiff.

Thomas Delos Laue, Ungaretti & Harris, Chicago, IL, Robert W. Gustafson, Bullwinkel Partners, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, United Potato Co., Inc., ("United Potato"), sued the defendants, Burghard & Sons, Inc., ("BSI"), and S.L. Davis, Inc., ("Davis"), under the Perishable Agricultural Commodities Act, 1930 ("PACA"), 7 U.S.C. § 499a *et seq.*, for enforcement of a default judgment entered by the United States Department of Agriculture. BSI moves for judgment on the pleadings or in the alternative for summary judgment.[1] For the following reasons, the motion is denied.

### Background

United Potato distributes produce and has its principal place of business in Chicago, Illinois. BSI distributes various products to grocery and convenience stores and has its principal place of business in Chicago. (Burghard Aff. ¶ 3). Davis distributes produce to restaurants and has its principal place of business in Bensenville, Illinois. (Davis Aff. ¶¶ 7, 11).[2] Between July 15, 1996, and August 13, 1996, United Potato sent sixteen loads of perishable potatoes and other vegetables to "Burghard Stein." (Rule 12(M) Statement ¶ 6; Complaint Exs. A-¶). The total cost of the vegetables was $8,088.70. Burghard Stein failed to pay for the vegetables. (Rule 12(M) Statement ¶ 11). The parties dispute whether BSI was doing business as Burghard Stein and whether BSI is responsible for payment of the vegetables.

On September 17, 1996, United Potato began administrative proceedings under PACA by filing a complaint with the Secretary of Agriculture ("Secretary") alleging nonpayment by the defendants. (Comp.¶ 7). BSI and Davis did not defend against the complaint. On December 10, 1996, the Secretary entered a reparations order against BSI and Davis requiring them to jointly and severally pay United Potato the money owed. (Pl.Ex. A). BSI and Davis did not appeal the Department of Agriculture's decision, but have yet to abide by the order. On March 18,

---

1. Since the parties have filed Local Rule 12(M) and 12(N) statements, BSI's motion will be considered one for summary judgment.

2. Davis was dissolved as an Illinois Corporation in September, 1997. (Rule 12(N) Response ¶ 3).

1997, United Potato filed this suit to enforce the order.

## Defenses

BSI offers a variety of defenses to argue it should not have to pay any money to United Potato. United Potato suggests that it is too late for BSI to offer a defense to the Secretary's reparations order because BSI did not appeal the order. Section 499g(c) of PACA states

> Either party adversely affected by the entry of a reparation order by the Secretary may, within thirty days from and after the date of such order, appeal therefrom to the district court of the United States for the district in which said hearing was held.... Such suit in the district court shall be a trial de novo and shall proceed in all respects like other civil suits for damages, except that the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated.

United Potato argues that if BSI wanted to offer new defenses, it needed to appeal the reparations order within thirty days of the date of the order. BSI did not appeal the Secretary's order and did not pay the reparations amount. Thus, United Potato brought suit under Section 499g(b), which states

> If any commission merchant, dealer, or broker does not pay the reparation award within the time specified in the Secretary's order, the complainant ... may within three years of the date of the order file in the district court of the United States for the district in which he resides ... a petition setting forth briefly the causes for which he claims damages and the order of the Secretary in the premises.... Such suit in the district court shall proceed in all respects like other civil suits for damages, except that the findings and orders of the Secretary shall be prima-facie evidence of the facts therein sated....

United Potato suggests that allowing BSI to offer new defenses under Section 499g(b) extends the time to appeal to three years and renders the thirty day limit in Section 499g(c) meaningless. United Potato argues that BSI forfeited its "trial de novo" by not appealing and that it would be inherently unfair to allow BSI to fail to answer the complaint before the Secretary, fail to defend the suit in front of the Secretary, fail to use rehearing and reconsideration avenues, fail to appeal the reparation order, fail to pay the reparation order, and still be allowed to raise defenses when suit is brought to enforce the reparation order.

■ While United Potato raises valid concerns, it appears the scheme Congress provided when it passed PACA allows BSI to offer new defenses under Section 499g(b). The plain language of Section 499g(b) states that suits to collect reparation awards "shall proceed in all respects like other civil suits for damages ...," indicating BSI has a right to offer defenses as it would in any other civil suit.

■ Other courts have considered the consequences of a company's failure to pay or appeal a reparations order. "Once a reparation order is issued against a broker, the broker must either pay the reparation award, appeal therefrom to the District Court, or suffer the suspension of his license." *Chidsey v. Geurin*, 443 F.2d 584, 586–587 (6th Cir.1971).[3] Both the Ninth Circuit and the Sixth Circuit found that the Secretary's repatriation award is not an enforceable judgment. *O'Day v. George Arakelian Farms, Inc.*, 536 F.2d 856, 859 n. 3 (9th Cir.1976); *Chidsey*, 443 F.2d at 586–587 ("A reparation order does not represent an enforceable obligation to make payment of a sum of money."). Thus, under PACA, an offender who does not pay a reparations award and does not appeal will only suffer the loss of its PACA license for two or three years. 7 U.S.C. § 499d(c); *O'Day*, 536 F.2d at 859 n. 3; *Chidsey*, 443 F.2d at 587. To collect payment, the complainant must sue under section 499g(b). In *O'Day*, the court found that in a judicial proceeding under 499g(b) "the merits of the claim are determined de novo except that the findings and order of

---

**3.** All brokers, merchants, or dealers of agricultural commodities must be licensed by the Secre- tary. 7 U.S.C. § 499c(a).

the Secretary constitute prima facie evidence of the facts recited." 536 F.2d at 859 n. 3. Thus, the penalty for refusing to pay or appeal a reparations award is not the loss of trial rights, but rather an opportunity to contest the loss of a license.

The Secretary has similarly interpreted Section 499g(b). *A. Sam & Sons Produce Co., Inc. v. Sol Salins, Inc.*, 50 Agric. Dec. 1044, 1059 (1991) ("[I]t is evident that the action in the district court [to enforce a repatriation order] is a trial de novo based on the pleadings before the Secretary."). The plain language of Section 499g(b) and its subsequent judicial interpretation permit a defendant a trial de novo and the right to raise new defenses. While this interpretation may not mesh perfectly with Section 499g(c), since Section 499g(c) was added to PACA four years after Section 499g(b) was enacted, it is unlikely Congress gave much consideration to conflicts that might exist between the two Sections. Accordingly, I find BSI may raise new defenses.

*A. Jurisdiction*

BSI argues the Secretary of Agriculture did not have jurisdiction to enter a reparations order against it. The Secretary has jurisdiction over a cause of action brought under PACA if: (1) the action involves a perishable agricultural commodity; (2) the transaction involves interstate commerce; (3) the action is against a licensee or someone operating subject to license under PACA; and (4) the complainant petitions the Secretary within nine months of the alleged harm. *Maggio, Inc. v. First Nat'l Stores, Inc.*, 39 Agric. Dec. 1179, 1179–80 (1980). BSI argues it was neither licensed nor subject to license at the time of the transactions that were the subject of the Secretary's reparations order.

The Secretary found that BSI was either licensed or subject to license at the time of the transactions in dispute. (Pl.Ex.

A). Thus, BSI must offer evidence to rebut this prima facie evidence. 7 U.S.C. § 499g(b). BSI argues that in 1992 its principal owner, Neil Burghard, formed Burghard Stein with his stepson, Shawn Davis, to aide Mr. Davis in starting his own produce distribution company. (Burghard Aff. ¶¶ 7–9). According to Mr. Burghard, BSI kept its business distinct from that of Burghard Stein. (Burghard Aff. ¶ 9). Mr. Burghard states that in 1994 or 1995 he transferred his interest in Burghard Stein to Mr. Davis who then formed S.L. Davis, Inc. (Burghard Aff. ¶¶ 12–13; Davis Aff. ¶¶ 10–11).[4] Subsequently, Mr. Davis moved the Burghard Stein business to Bensenville, Illinois while Mr. Burghard continued BSI's business in Chicago. (Burghard Aff. ¶ 14). BSI argues it was no longer subject to license under PACA after the sale of Burghard Stein to Mr. Davis.

BSI's argument is belied by the papers presented in this case. United Potato presents a PACA license for BSI that was valid from June 23, 1995 to June 23, 1996. (Pl.Ex. F). Shawn Davis is listed as a principal of BSI. Additionally, the license lists Burghard Stein of Bensenville, Illinois, as a trade name and branch of BSI. *Id.* The only change requested to the license at the time of its renewal in 1995 was the deletion of Larry Stein as a principal of BSI. Thus, BSI was aware it could change its PACA license to reflect personnel and name changes, but kept Burghard Stein as a trade name.

BSI's license expired on June 23, 1996, less than a month before the transactions at issue in this case. In essence, BSI argues that less than four weeks after its license expired it was no longer subject to license under PACA. The Secretary found otherwise and BSI has not presented sufficient evidence to overcome this prima facie finding.[5]

*B. Trust*

BSI argues the Secretary's reparations order merely enforces the proceeds of a PACA

---

4. Mr. Burghard states that the transaction was finalized through a "Bill of Sale" without the aide of lawyers. Neither the "Bill of Sale" nor any other document indicating a transaction occurred is attached to the motion for summary judgment.

5. Mr. Burghard's affidavit summarily stating BSI was not subject to license is simply a legal conclusion.

trust set up by Section 499e(c) of PACA. BSI says it never took possession of the vegetables supplied by United Potato and thus, no PACA trust exists for United Potato's benefit.

■ "The PACA creates a statutory trust for unpaid sellers of perishable agricultural commodities and provides that all such commodities, as well as accounts receivable from the sale of such commodities, 'shall be held by ... [the] broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment ... has been received....'" *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir.1997) (quoting 7 U.S.C. § 499e(c)(2)). The PACA trust puts sellers in a position "superior" to other creditors. *Id.* The idea behind the PACA trust is to aide the seller to recover proceeds from delinquent purchasers and vests the district courts of the United States with jurisdiction to hear "actions by trust beneficiaries to enforce payment from the trust...." 7 U.S.C. § 499e(c)(5).

■ In enacting the PACA trust provisions in 1984, Congress stated that the PACA trust remedy was "in addition to existing remedies under [PACA] including *reparation proceedings before the Secretary*, court actions, or other existing remedies." H.R.Rep. No. 98–543, reprinted in 1984 U.S.C.C.A.N. 405, 410 (emphasis added). BSI's argument that a reparation order merely enforces a PACA trust makes little sense in light of Congress' clear intent that a PACA trust be an additional remedy to the Secretary's reparations orders and the fact the PACA trust provisions were added to PACA over fifty years after enactment of the reparations provisions of the Act.

In the instant case, there is no evidence that United Potato availed itself of the PACA trust provisions. Instead, it sought a reparation order. Thus, BSI's argument that there is no res in the trust is inapposite.

### C. Statute of Frauds

BSI argues both the Illinois Frauds Act ("Frauds Act"), 740 ILCS 80/1, and the Uniform Commercial Code's ("UCC") Statute of Frauds provision, as adopted in Illinois, 810

ILCS 5/2–201, are applicable to this case and bar this action. One case, which both parties cite to support their position, extensively considered the applicability of a statute of frauds provision in PACA cases. *Rothenberg v. H. Rothstein & Sons*, 183 F.2d 524, 526 (3d Cir.1950). The *Rothenberg* court found that, to the extent a state's statute of frauds provision is substantive in nature and renders a contract "wholly void" at the time of formation, the contract is incapable of supporting a reparation order from the Secretary. *Id.* at 527. If, however, a state's statute of frauds provision simply precludes enforcement of a contract in the state courts but otherwise leaves the contract valid, it has no effect before a district court in a PACA case. *Id.; accord Branch v. Mission Shippers, Inc.*, 35 Agric. Dec. 726, 731 (1976).

Neither party has addressed the issue of whether either the Frauds Act or the UCC's Statute of Frauds has a substantive or procedural effect. The Illinois Supreme Court, in dicta, recently commented on the procedural nature of the Frauds Act:

> The [Frauds Act] proceeds from the legislature's sound conclusion that while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing. It functions more as an evidentiary safeguard than as a substantive rule of contract.

*McInerney v. Charter Golf, Inc.*, 176 Ill.2d 482, 680 N.E.2d 1347, 1351, 223 Ill.Dec. 911, 915 (Ill.1997). Almost a century ago the Illinois Supreme Court noted "[w]here a contract is alleged to be invalid as being in violation of the [Frauds Act], it is merely voidable, and may be enforced as made, unless the defendant takes advantage of the [Act] by setting it up as a defense either by demurrer, plea or answer." *Koenig v. Dohm*, 209 Ill. 468, 475, 70 N.E. 1061, 1063 (Ill.1904); *accord Stein v. McKinney*, 313 Ill. 84, 91, 144 N.E. 795, 797 (Ill.1924).

■ Additionally, the texts of the Frauds Act and the UCC Statute of Frauds indicate they are procedural doctrines. The Frauds Act applies to surety agreements, a ground BSI uses to argue it is not liable for Burghard Stein's debts to United Potato. The Frauds Act states "[n]o action shall be

brought ..." to enforce a surety agreement unless the agreement is in writing and signed by the party charged as the surety. 740 ILCS 80/1. The plain language of the Frauds Act indicates it prohibits the enforcement of unwritten surety agreements, but does not render such agreements void at the time of formation.[6]

BSI also argues that under the UCC Statute of Frauds provision it is not liable for many of the vegetable deliveries that occurred because the value of the vegetables were more than $500, but the delivery slips were not signed. The language of the UCC Statute of Frauds similarly supports a conclusion that it is procedural only. The Statute provides that "a contract for the sale of goods for the price of $500 or more is *not enforceable* by way of action or defense unless there is some writing ... signed by the party against whom enforcement is sought...." 810 ILCS 5/2–201 (emphasis added).

Based on the text and interpretation of the Frauds Act and UCC Statute of Frauds, I find the Frauds Act and the UCC Statute of Frauds have a procedural effect. Since the Frauds Act and UCC Statue of Frauds do not render contracts which violate their terms void but merely prohibit a contract's enforcement in Illinois state courts, the Secretary's reparation order was properly supported.

A similar conclusion was reached in *Rothenberg*, 183 F.2d at 527–28. After determining that Pennsylvania's UCC Statute of Frauds provision had a procedural effect that did not void the disputed contract, the court considered whether the statute of frauds could still be used as a defense to contract enforcement in a PACA case. *Id.* at 528. The court noted that since a PACA case is not brought under the diversity jurisdiction of the federal courts, a district court is not obligated to enforce the state statute. *Id.* The court found the statute of frauds would only be applicable if PACA adopted the statute of frauds "as a limitation upon the remedy granted by [PACA]." *Id.* In viewing PACA, the court determined there was "nothing in the federal act which would suggest that the remedy conferred by [Section 499e] upon an injured party to a contract by sale of perishable agricultural commodities shall not be available if under the laws of the particular state which is involved a suit on the contract could not have been maintained in the state court." *Id.*

The *Rothenberg* court's construction of PACA is in accord with the broad remedial goal of PACA.[7] As noted in Section 499e(b), PACA "shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of [PACA] are *in addition to such remedies.*" (emphasis added). Thus, PACA was meant to add a remedy beyond those already provided by the states and other statutes.

In sum, the Frauds Act and UCC Statute of Frauds have a procedural effect that does not preclude the Secretary's reparations order and does not impair the remedies provided by PACA. Accordingly, BSI's statute of frauds arguments are inapposite.

### Conclusion

Although BSI may raise new defenses in this case, none of the defenses raised aide BSI in its motion for summary judgment. BSI's motion for summary judgment is denied.[8]

---

**6.** The Oklahoma Statute of Frauds list a variety of agreements and states "[t]he following contracts are *invalid*, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged...." Okla. Stat. tit. 15 § 136 (emphasis added). In contrast to the Frauds Act, the Oklahoma Statute makes clear that certain agreements not in writing are void at the time of formation.

**7.** The Secretary has consistently followed the reasoning set forth by the *Rothenberg* court when dealing with statute of frauds issues. *Willoughby v. Frito–Lay, Inc.*, 45 Agric. Dec. 1245, 1259–61 (1986); *Whitfield v. City Wide Distributors, Inc.*, 44 Agric. Dec. 936, 941–945 (1985); *Branch*, 35 Agric. Dec. at 731–32.

**8.** BSI's motion for sanctions is denied.